PEOPLE v HEGEDUS

Docket No. 83601. Argued March 8, 1989 (Calendar No. 8). Decided
   July 3, 1989.

Patrick Hegedus was charged in the Oakland Circuit Court with
   involuntary manslaughter and conspiracy to violate the Michi-
   gan Occupational Safety and Health Act. The charges arose as
   a result of the death of an employee from carbon monoxide
   intoxication while working in a van owned by a company for
   whom the defendant worked as a supervisor. The court, Francis
   X. O'Brien, J., granted the defendant's motion to quash the
   information on the manslaughter charge and reversed the
   binding over on the ground that the defendant had no duty or
   ability to inspect the van or to take it out of service. The Court
   of Appeals, McDONALD and E. M. THOMAS, JJ. (DANHOF, C.J.,
   dissenting), affirmed, finding that criminal prosecution was
   preëmpted by the federal Occupational Safety and Health Act
   (Docket No. 97367). The people appeal.

   In a unanimous opinion by Justice BOYLE, the Supreme Court
   *held:*

   The federal Occupational Safety and Health Act does not
   preëmpt state criminal prosecution for a death occurring in the
   workplace, even though it was allegedly caused by conduct that
   violated OSHA standards.

   1. The federal Occupational Safety and Health Act, 29 USC
   651 *et seq.,* imposes a general duty on every employer to
   furnish to each employee employment and a place of employ-
   ment free from recognized hazards that cause or are likely to
   cause death or serious physical harm. OSHA is primarily regula-
   tory in nature, designed to prevent workplace deaths and
   injuries before they occur by promulgating specific health and
   safety standards and enforcement and review procedures,
   rather than the assessing of penalties for injuries already
   suffered. Its orientation is prophylactic in nature, containing

REFERENCES

. Am Jur 2d, Plant and Job Safety—OSHA and State Laws §§ 3-8,
   131, 132.
   See the Index to Annotations under Labor and Employment; Occu-
   pational Safety and Health; Pre-emption.

both civil and criminal penalties that can be assessed against employers who violate either those specific, promulgated standards or the general duty.

2. The existence of federal laws or regulations in a particular area can preëmpt state action in the same field where preëmption is either express, implied, or the result of a conflict between state and federal law. The extent to which federal law actually preëmpts state authority is a question of congressional intent, and it is assumed that the police powers of the states are not superseded by a federal act without a clear and manifest expression of Congressional purpose.

3. The states' criminal laws are not expressly preëmpted by OSHA. Section 18(a) of the federal act has the clear effect of preserving state jurisdiction over safety and health issues where no federal standard exists. Section 18(b) is expressly limited to the development and enforcement of state standards relating to such issues and does not affect the enforcement of a state's general criminal laws.

4. An occupational safety and health standard is a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary to provide safe or healthful employment and places of employment. The manslaughter statute under which the defendant was charged is not a standard in the sense intended by the act. It does not require a particular condition, or mandate the use of prescribed practices or means in order to ensure the existence of a safe and healthful work environment. Standards are prophylactic measures, prescribing or proscribing specific practices; in contrast, general state criminal laws are reactive measures, focusing on conduct after an injury has occurred. Section 17(e) of OSHA, which provides criminal sanctions for a wilful violation of a specific standard that results in the death of an employee cannot be called a standard; it does not literally prescribe or proscribe conduct.

5. The question of preëmption cannot be resolved with reference to the possible incidental effects of state action; rather, it is the purpose of the state action that governs the express preëmption inquiry. There is a legitimate and substantial purpose on the part of Michigan, apart from regulating health and safety, to enforce its criminal laws even though the conduct occurred in the workplace. While OSHA is concerned with protecting employees as workers from specific safety and health hazards connected with their occupation, the state is concerned with protecting the employees as citizens from criminal conduct. Moreover, when § 4(b)(4), the act's saving clause, evidenc-

ing a general congressional intent to leave existing state common-law rules and statutes intact so far as possible, is considered along with the general presumption against preëmption, the conclusion is inescapable that the jurisdictional requirements of § 18 are to be read narrowly to preëmpt only unauthorized workplace standards, not state criminal laws.

6. Preëmption may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the conclusion that Congress left no room for supplementary state regulation. Preëmption also may be inferred where the field sought to be preëmpted is one in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. It cannot be contended seriously that the federal interest in workplace safety and health outweighs the state's. Against the federal interest in this case must be balanced not only the state's predominant historical interest in the regulation of health and safety matters, but also its traditional police powers interest in prosecuting criminal conduct. The interpretation most consistent with the act's goals is that Congress did not intend to preclude state penalties, but rather intended to allow states to supplement OSHA penalties with their own sanctions.

7. Preëmption of state action also may be found if a conflict exists between state and federal laws. There is no such conflict in this case. The application of Michigan criminal laws to conduct in the workplace does not present an obstacle to the accomplishment of OSHA's stated goal of assuring employees safe and healthful working conditions. The inclusion of a few minor criminal sanctions within OSHA for wilful violations of its standards does not evidence an intent to subordinate the traditional police powers of Michigan to the limited authority of the federal government to such an extent that the state is unable to enforce its laws against serious criminal conduct directed at its citizens. The mere fact that such conduct takes place in an employment setting, where there is a limited federal interest in protecting the safety and health of employees, is insufficient to remove from the state its traditional authority and responsibility to protect the welfare of its citizens.

8. In this case, because the Court of Appeals failed to reach the question whether the magistrate abused his discretion in binding over the defendant on the involuntary manslaughter charge, the case must be reversed and remanded to the Court of Appeals for consideration of that issue.

Reversed and remanded.

169 Mich App 62; 425 NW2d 729 (1988) reversed.

1. HOMICIDE — INVOLUNTARY MANSLAUGHTER — OCCUPATIONAL SAFETY AND HEALTH ACT — FEDERAL PREËMPTION.

   The federal Occupational Safety and Health Act does not preëmpt state criminal prosecution for a death occurring in the workplace, even though it was allegedly caused by conduct that violated the act's standards (29 USC 651 *et seq.*; MCL 750.321; MSA 28.553).

2. HOMICIDE — INVOLUNTARY MANSLAUGHTER — OCCUPATIONAL SAFETY AND HEALTH ACT — FEDERAL PREËMPTION.

   Application of the Michigan manslaughter statute to conduct in the workplace is neither expressly nor impliedly preëmpted by the federal Occupational Safety and Health Act; the statute is not a standard under the act, serves a legitimate and substantial purpose apart from regulating health and safety, and does not present an obstacle to the act's goals; the mere fact that the criminal conduct occurs in an employment setting where there is a limited federal interest is insufficient to remove the state's traditional police power (29 USC 651 *et seq.*; MCL 750.321; MSA 28.553).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief, Appellate Division, and *Michael J. Modelski,* Assistant Prosecuting Attorney, for the people.

*Kenneth M. Mogill,* for the defendant.

Amicus Curiae:

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Robert Ianni* and *Theodore S. Klimaszewski,* Assistant Attorneys General.

BOYLE, J. We consider in this case whether the criminal sanctions for certain violations of health and safety standards set forth in the Occupational Safety and Health Act[1] preclude the state from prosecuting the defendant for involuntary man-

---

[1] 29 USC 651 *et seq.*

slaughter. We hold that the statute does not preëmpt state action in this case, even though the victim's death occurred "in the workplace" and was allegedly caused by conduct that violated OSHA standards. Congress did not intend to preclude the enforcement by this state of its criminal laws simply because the alleged criminal activity occurred in the employment setting.

I

FACTS AND PROCEEDINGS

The defendant, Patrick Hegedus, was charged with involuntary manslaughter, MCL 750.321; MSA 28.553, and conspiracy to violate the Michigan Occupational Safety and Health Act,[2] MCL 408.1035(5); MSA 17.50(35)(5) and MCL 750.157a(a); MSA 28.354(1)(a). The charges arose out of the January 18, 1985, death of William Hatherill, an employee of Jackson Enterprises, a company for which defendant Hegedus worked as a supervisor. Mr. Hatherill died of carbon monoxide intoxication while working in a company-owned van. The prosecution contends that the poor condition of the van's undercarriage and exhaust system allowed exhaust fumes to leak inside the van, causing Hatherill's death.

After a preliminary examination, the defendant was bound over on the charge of involuntary manslaughter.[3] Defendant's subsequent motion to

[2] MCL 408.1001 *et seq.*; MSA 17.50(1) *et seq.*

[3] The conspiracy charge against the defendant, along with similar charges against Richard and John Jackson, the owner and general manager, respectively, of Jackson Enterprises, was dismissed at the preliminary hearing. The circuit court affirmed the dismissal. The state filed an application for leave to appeal with the Court of Appeals, which was denied. This Court ordered the case remanded to the Court of Appeals for consideration as on leave granted. *People v Jackson,* 429 Mich 875 (1987). The Court of Appeals affirmed the

quash the information on the manslaughter charge and reverse the binding over was granted by the circuit court, substantially on the basis that the defendant either had no duty to inspect the van or no duty or ability to take it out of service. The prosecution appealed as of right.

After receiving the parties' initial briefs, the Court of Appeals ordered supplemental briefs addressing the issue whether criminal prosecutions based on conditions in the workplace are preëmpted by either MIOSHA or OSHA. The Court of Appeals ultimately affirmed the trial court's quashing of the information, finding that criminal prosecution was preëmpted by OSHA. *People v Hegedus,* 169 Mich App 62, 68; 425 NW2d 729 (1988) (DANHOF, C.J., dissenting). This Court granted leave to appeal. *People v Hegedus,* 431 Mich 870 (1988).[4]

II

OSHA

OSHA's stated "purpose and policy" is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 USC 651(b). To that end, the act gives the Secretary of Labor broad authority and responsibility to establish specific health and safety standards for "businesses affecting interstate commerce." 29

dismissal of charges against the defendants. *People v Jackson,* unpublished opinion per curiam, decided September 1, 1988 (Docket No. 104738).

[4] Because we address only the finding of preëmption by the Court of Appeals and not the propriety of the binding over, a detailed recital of the testimony at the examination is unnecessary. For present purposes, it will suffice to note that evidence was introduced which would support a finding that Mr. Hatherill's death was caused by the emission of carbon monoxide fumes into the truck at levels constituting a "serious violation" of the carbon monoxide exposure standard.

USC 651(b)(3). The act also imposes upon every employer a general duty to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 USC 654(a)(1).

OSHA is primarily regulatory in nature, designed to prevent workplace deaths and injuries before they occur. Thus, its emphasis is on the promulgation of health and safety standards and enforcement and review procedures, rather than the assessment of penalties for injuries already suffered. As the United States Supreme Court stated in *Whirlpool v Marshall*, 445 US 1, 12; 100 S Ct 883; 63 L Ed 2d 154 (1980), "the legislation's remedial orientation is prophylactic in nature."[5]

The act does contain, however, both civil and criminal penalties that can be assessed against employers who violate either specific, promulgated standards or the general-duty clause of § 5(a)(1). For example, OSHA provides for *civil* penalties of up to $1000 for "serious" violations of either the general-duty clause or specific standards.[6] Up to

---

[5] The *Whirlpool* Court continued, noting that "[t]he Act does not wait for an employee to die or become injured. It authorizes the promulgation of health and safety standards and the issuance of citations in the hope that these will act to prevent deaths or injuries from ever occurring." *Id.*

[6] 29 USC 666(b). A "serious" violation is defined in § 17(k):

[A] serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

$10,000 may be assessed for "willful" or repeated violations.[7]

OSHA also provides for *criminal* sanctions under certain circumstances. Section 17(f) makes the unauthorized advance notification of an OSHA inspection a crime punishable by a fine of not more than $1000 or by imprisonment for not more than six months, or both. Section 17(g) makes knowingly filing false statements with the Occupational Safety and Health Review Commission (OSHRC) a crime punishable by a fine of up to $10,000 or by imprisonment for up to six months, or both.

---

[7] 29 USC 666(a). A "willful" violation for purposes of § 17 is not defined in the act. However, we note that most circuits of the federal Court of Appeals continue to adhere generally to the definition of wilful announced by the Court of Appeals for the Fourth Circuit in *Intercounty Construction Co v Occupational Safety & Health Review Comm*, 522 F2d 777, 779-780 (CA 4, 1975), cert den 423 US 1072 (1976):

> "[W]illful" means action taken knowledgeably by one subject to the statutory provisions in disregard of the action's legality. No showing of malicious intent is necessary. A conscious, intentional, deliberate, voluntary decision properly is described as willful, "regardless of venial motive." [Citation omitted.]

The Court of Appeals for the Sixth Circuit adopted this definition in *Empire-Detroit Steel v OSHRC*, 579 F2d 378, 384 (CA 6, 1978). See also *Ensign-Bickford Co v OSHRC*, 230 US App DC 362, 365; 717 F2d 1419 (1983), cert den 466 US 937 (1984); *Nat'l Steel & Shipbuilding Co v OSHRC*, 607 F2d 311, 313-315 (CA 9, 1979).

Unlike OSHA, MIOSHA does define the term "wilful," although only for purposes of criminal prosecutions. MCL 408.1006(8); MSA 17.50(6)(8) provides:

> "Wilful," for the purpose of criminal prosecutions, means the intent to do an act knowingly and purposely by an individual who, having a free will and choice, either intentionally disregards a requirement of this act, or a rule or standard promulgated pursuant to this act, or is knowingly and purposely indifferent to a requirement of this act, or a rule or standard promulgated pursuant to this act. An omission or failure to act is wilful if it is done knowingly and purposely. Wilful does not require a showing of moral turpitude, evil purpose, or criminal intent provided the individual is shown to have acted or to have failed to act knowingly and purposely.

The relevant section in this case is § 17(e), which provides criminal sanctions for a "willful" violation of a specific standard that results in the death of an employee. Section 17(e) states:

> Any employer who willfully violates any standard, rule, or order promulgated pursuant to section 655 of this title, or of any regulations prescribed pursuant to this chapter, and that violation caused death to any employee, shall, upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than six months, or by both; except that if the conviction is for a violation committed after a first conviction of such person, punishment shall be by a fine of not more than $20,000 or by imprisonment for not more than one year, or by both.[8]

The defendant contends that if he is subject to any criminal liability for his acts or omissions in causing the victim's death, it is under this section of OSHA, not under any state criminal law such as the manslaughter statute under which he was charged. MCL 750.321; MSA 28.553. The defendant argues that both the legislative history of OSHA and its comprehensive scope indicate that Congress intended to fully occupy the entire field of worker health and safety, and that to the extent that the state criminal sanctions sought to be applied in this case differ from or conflict with those found in OSHA, they are inapplicable as a result of the Supremacy Clause of the United States Constitution.[9]

---

[8] Note that, unlike the civil penalties described above, these criminal sanctions apply only to violations of specific standards that cause an employee's death. They do not apply to a violation of the general-duty clause of § 5(a)(1) or to a violation of a specific standard that results only in injury, not in death.

[9] Article VI, cl 2 of the United States Constitution invalidates state laws that "interfere with, or are contrary to" federal law. *Gibbons v Ogden*, 22 US (9 Wheat) 1, 211; 6 L Ed 23 (1824) (Marshall, C.J.).

## III

## OSHA PREËMPTION

### A

Generally, the existence of federal laws or regulations in a particular area can preëmpt state action in the same field where preëmption is either express, implied, or the result of a conflict between state and federal law.[10] In each of these situations, the extent to which federal law actually preëmpts state authority is a question of congressional intent. " '[T]he purpose of Congress is the ultimate touchstone.' " *Fort Halifax Packing Co v Coyne*, 482 US 1, 8; 107 S Ct 2211; 96 L Ed 2d 1 (1987) (quoting *Malone v White Motor Corp*, 435

Since preëmption by OSHA is grounded in the Supremacy Clause, the question whether MIOSHA in some way "preëmpts" a general criminal prosecution in this case is not subject to the same analysis. We find it unlikely that any support could be found for the proposition that MIOSHA precludes the prosecution of defendant for manslaughter in this case, but acknowledge that in any event the Court of Appeals did not address the issue.

[10] *Hillsborough Co v Automated Medical Labs, Inc*, 471 US 707, 713; 105 S Ct 2371; 85 L Ed 2d 714 (1985).

First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. [Second,] [i]n the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. Pre-emption of a whole field also will be inferred where the field is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."

[Finally], where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" . . . . [Citations omitted.]

US 497, 504; 98 S Ct 1185; 55 L Ed 2d 443 (1978). In addition, "[w]here, as here, the field which Congress is said to have pre-empted has been traditionally occupied by the States . . . 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' *Rice v Santa Fe Elevator Corp,* 331 US 218, 230 [67 S Ct 1146; 91 L Ed 1447] (1947)." *Jones v Rath Packing Co,* 430 US 519, 525; 97 S Ct 1305; 51 L Ed 2d 604 (1977).

B

EXPRESS PREËMPTION

The defendant does not argue that OSHA expressly preëmpts the application of state criminal laws to conduct in the workplace.[11] The Court of Appeals, however, apparently found such express preëmption by virtue of § 18 of the act. Section 18 provides in relevant part:

(a) Assertion of State standards in absence of applicable Federal standards

Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of this title.

(b) Submission of State plan for development and enforcement of State standards to preëmpt applicable Federal standards

Any State which, at any time, desires to assume responsibility for development and enforcement

---

[11] *[W]hile the language of OSHA provides no express answer,* the comprehensiveness of the statutory plan and the relationship of its criminal sanction to the plan as a whole point clearly to preëmption of state criminal laws as to workplace-related deaths. [Emphasis added.]

therein of occupational safety and health stan-
dards relating to any occupational safety or health
issue with respect to which a Federal standard has
been promulgated under section 655 of this title
shall submit a State plan for the development of
such standards and their enforcement.

The Court of Appeals properly interpreted this
language to mean that a state may assert jurisdic-
tion over an occupational safety and health issue
"*only if* there is no federal standard in effect . . .
or the state has submitted its own enforcement
plan to the United States Secretary of Labor for
approval pursuant to [§ 18(b)]." *People v Hegedus,
supra,* p 67 (emphasis added). However, the Court
of Appeals then improperly concluded that the
prosecution of the defendant in this case in fact
amounted to an assertion of jurisdiction over just
such an issue.

The Court of Appeals reasoned that since OSHA
does contain standards regulating the existence
and allowable proportions of carbon monoxide in
the workplace, the state may not exert jurisdiction
over "this issue" except through an approved state
plan. *Id.,* p 68. Observing that this case was not
prosecuted under the state's approved plan (MIO-
SHA), but rather on "general criminal charges," the
Court concluded that such prosecution was an
improper attempt not only to circumvent the pen-
alties prescribed in MIOSHA, but also to assert
jurisdiction over a federally covered occupational
safety and health issue through means other than
an approved plan.

The Court of Appeals misreads § 18. Section
18(a) has the clear effect of actually *preserving*
state jurisdiction over safety and health issues
with respect to which no federal standard exists,
while the language of § 18(b) is expressly limited
to the development and enforcement of state *stan-*

*dards* relating to such issues, and thus does not affect the enforcement of a state's general criminal laws.

The term "occupational safety and health standard" is defined as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary to provide safe or healthful employment and places of employment." 29 USC 652(8). The manslaughter statute under which the defendant was charged in this case is not a "standard" in the sense intended by the act. It does not require particular conditions, or mandate the use of prescribed practices or means, etc., in order to ensure the existence of a safe and healthful work environment. As one commentator explained, "[s]tandards are . . . ex ante, prophylactic measures prescribing or proscribing specific practices. In contrast, general state criminal laws . . . are ex post, reactive measures, focusing on conduct after an injury has occurred."[12] For the same reasons, § 17(e) itself cannot be called a "standard." It is a penalty provision. It does not literally prescribe or proscribe conduct.[13]

The Court of Appeals characterized the prosecution of the defendant under the state's general criminal laws as an attempt to "assert jurisdiction over a federally covered occupational safety and health issue other than through an approved state plan." *Hegedus, supra,* p 68. To allow such action, it concluded, would "emasculate" the requirement

[12] Note, *Getting away with murder: Federal OSHA preemption of state criminal prosecutions for industrial accidents,* 101 Harv L R 535, 543 (1987).

[13] Perhaps the most telling evidence that the penalty provisions within OSHA were never intended to be thought of as standards themselves is the fact that the federal regulations which purport to define, describe, and interpret those standards make no reference whatsoever to either the civil or criminal sanctions found in the act. See 29 CFR 1910.1 *et seq.*

of § 18 that the state act through an approved plan. It thus appears that what the Court really was concerned with is the state's apparent ability to accomplish the same purpose or end to which safety and health standards are created—regulation of workplace conduct—without having to go through the process of approval the act requires. It therefore in effect concluded that Congress intended § 18(b) to preëmpt all state laws to the extent that they regulate workplace safety and health. We disagree.

In *People v Chicago Magnet Wire Corp,* 157 Ill App 3d 797, 801; 510 NE2d 1173 (1987), the Illinois Court of Appeals similarly concluded that the state was precluded from enforcing its criminal laws as to "conduct related to working conditions now regulated by OSHA."[14] On appeal, the Illinois Supreme Court rejected this implicit regulation analysis and in reversing the intermediate court stated:

> We cannot accept the defendants' contention that it must be concluded that Congress intended to preëmpt the enforcement of State criminal laws in regard to conduct of employers in the workplace because the State criminal laws *implicitly* enforce occupational health and safety standards. [*People v Chicago Magnet Wire Corp,* 126 Ill 2d 356, —; 534 NE2d 962, 966 (1989). Emphasis added.]

It is true that the knowledge that general criminal sanctions, such as prosecution for manslaugh-

[14] See also *Sabine Consolidated, Inc v State,* 756 SW2d 865 (Tex App, 1988). The Texas Court of Appeals in *Sabine* agreed with the Illinois Court of Appeals, stating that it "concur[red] with that court's holding that OSHA preëmpts any state regulation of workplaces governed by OSHA safety standards, to the extent that such regulation effectively establishes new workplace safety standards. We also believe that the criminal prosecutions here amount to such regulation." *Id.,* p 868.

ter, are available in sufficiently egregious situations is likely to affect an employer's actions in the workplace. It is also likely that the fear of a criminal conviction would cause an employer to adhere more closely to promulgated OSHA standards to ensure that no such situation results. However, as myriad overlapping areas of state and federal law demonstrate, it can only rarely be said that the enforcement of state laws is precluded simply because it tends of necessity to affect the regulated conduct.[15] We agree with the Illinois Supreme Court that in this context the preëmption question cannot be resolved with reference to the possible incidental effects of state action. Rather, it is the purpose of the state action that governs the express preëmption inquiry.

In *Environmental Encapsulating Corp v New York City,* 855 F2d 48 (CA 2, 1988), the United States Court of Appeals for the Second Circuit considered the claim that the city's program for training and certification of workers who handle asbestos, administered through its Department of Environmental Protection, was preëmpted by OSHA.[16] In rejecting the claim that § 18 expressly

[15] State action in the field of labor law, despite the existence of the National Labor Relations Act, 29 USC 151 *et seq.,* is a good example of an area in which "overlapping" is tolerated. The United States Supreme Court generally has taken a liberal attitude toward, for example, state regulation concerning employment discrimination, *Colorado Anti-Discrimination Comm v Continental Air Lines,* 372 US 714; 83 S Ct 1022; 10 L Ed 2d 84 (1963), and unemployment compensation, *New York Telephone Co v New York Dep't of Labor,* 440 US 519; 99 S Ct 1328; 59 L Ed 2d 553 (1979). As the Court stated in *Amalgamated Ass'n of Street Railway & Motor Coach Employees v Lockridge,* 403 US 274, 289; 91 S Ct 1909; 29 L Ed 2d 473 (1971), it "cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States."

[16] Plaintiffs were asbestos abatement contractors whose employees removed asbestos from buildings within the city. The city contended that the program should not be preëmpted since its primary goal was to safeguard public health, not merely to regulate the safety and health of employees. *Environmental Encapsulating, supra,* p 50.

preëmpted the city's program, the court in *Environmental Encapsulating* first observed that the program had a "dual" purpose, both to protect public health and to safeguard employee health and safety. *Id.,* p 56. It then went on to consider the effect of § 18 on state or local regulations "which have a legitimate purpose apart from one promoting occupational health and safety, but which also—even if incidentally—in fact promote occupational health and safety." *Id.,* pp 56-57. The court ultimately concluded that OSHA does not preëmpt such regulations:

> Thus, we hold that in order to avoid preëmption the City must demonstrate only that for each of the DEP requirements there is a legitimate and substantial purpose apart from protecting asbestos workers. If this is demonstrated, the particular requirement is not a state "occupational safety and health standard" preëmpted by § 18. [*Id.,* p 57.]

The "legitimate and substantial purpose" test of *Environmental Encapsulating* recognizes both the intention of Congress to establish a "federal floor for safety in the workplace," *United Steelworkers of America v Auchter,* 763 F2d 728, 734 (CA 3, 1985), and the interest of the states in retaining their historic police powers.[17]

We similarly conclude that there is a "legiti-

---

[17] See also *New Jersey Chamber of Commerce v Hughey,* 774 F2d 587 (CA 3, 1985), holding somewhat differently from the court in *Environmental Encapsulating* that OSHA does not preëmpt state regulations whose "primary purpose" was not the regulation of occupational safety and health. The *Hughey* court made the following observation regarding the effect of § 18:

> Because OSHA standards by definition govern occupational safety and health issues, they do not preëmpt state laws that regulate other concerns. The Secretary has authority to promulgate standards only as to occupational safety and health and those standards cannot have a preëmptive effect beyond

mate and substantial purpose" on the part of this state, apart from regulating *occupational* health and safety, in enforcing its criminal laws even though the conduct occurred in the workplace. While deterrence, and thus to some extent regulation, is one aim of general criminal laws, so too is punishment—clearly not one of OSHA's primary goals. A more important purpose, however, is the protection of employees as members of the general public. While OSHA is concerned with protecting employees as "workers" from specific safety and health hazards connected with their occupations, the state is concerned with protecting the employees as "citizens" from criminal conduct. Whether that conduct occurs in public or in private, in the home or in the workplace, the state's interest in preventing it, and punishing it, is indeed both legitimate and substantial.[18]

---

that field. . . . We hold that the New Jersey Right to Know Act is expressly preëmpted by the OSH Act and the Hazard Communication Standard only insofar as the New Jersey Act pertains to protection of employee health and safety in the manufacturing sector. [*Id.,* p 593.]

[18] The prosecution contends that the United States Supreme Court has spoken on this issue, albeit in terms of implied preëmption or conflict preëmption. It cites *Silkwood v Kerr-McGee Corp,* 464 US 238; 104 S Ct 615; 78 L Ed 2d 443 (1984), in which the Court addressed the question whether state courts were preëmpted by the Atomic Energy Act, 42 USC 2011 *et seq.,* from assessing punitive damages against a defendant for injuries resulting from excessive radiation. The Court found that even though the state was precluded from regulating the safety aspects of nuclear energy, *Pacific Gas & Electric v State Energy Resources Conservation & Development Comm,* 461 US 190, 205; 103 S Ct 1713; 75 L Ed 2d 752 (1983), it was not precluded from granting punitive damages. The Court specifically found unpersuasive the defendant's argument that since a state-sanctioned punitive damages award "deters conduct related to radiation hazards," it should be preëmpted:

It may be that the award of damages based on [sic] the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory

We thus cannot agree with the Court of Appeals that § 18 of the act, the focus of which is the administrative regulation of workplace health and safety through specific, promulgated standards, was clearly intended to deprive citizens, merely by virtue of their status as employees, of the historic protection of this state's criminal laws.

In addition to the limited relevance of § 18 to the question before us, we note the inclusion of a "saving clause" within the act to guard against undue restrictions upon state action in this area. Section 4(b)(4) of the act states:

> Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

The Court of Appeals interpreted this provision as reflecting a congressional intent to "leave undisturbed private rights and liabilities of employers and employees such as those found in the Workers' Disability Compensation Act or the Civil Rights Act." *Hegedus, supra,* p 68. It should be strictly construed, the Court argued, to preserve only other laws regulating relations between employers and employees, which criminal laws are not primarily designed to do.[19]

consequence was something that Congress was quite willing to accept. [*Silkwood, supra,* p 256.]

With regard to OSHA, we note the apparent congressional intent to accept at least some incidental regulation of workplace activity, as evidenced by the act's "saving clause," § 4(b)(4), which lists those rights and duties that are expressly *not* preempted by OSHA.

[19] The defendant also briefly discusses § 4(b)(4). He finds significant

There is some merit to the argument that § 4(b)(4) was never intended by Congress specifically to save criminal law from preëmption. As one author points out, there is no indication in either the act itself or its legislative history that Congress ever contemplated the effect that criminal laws might have on OSHA enforcement. Note, *Getting away with murder: Federal OSHA preëmption of state criminal prosecutions for industrial accidents,* 101 Harv L R 535, 543 (1987).

However, it is also true that § 4(b)(4) arguably includes criminal laws among those specifically not "superseded." It states that the act should not be read to supersede or affect either any workers' compensation law or the "common law or *statutory* rights, *duties, or liabilities of employers . . .* under *any* law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." (Emphasis added.) The manslaughter law under which the state seeks to impose "statutory liability" upon the defendant for the death of an employee arguably qualifies as "any law" under the above language. As written, the section does not appear to be in any way qualified, other than by the "arising out of, or in the course of, employment" language, which also apparently is met here.

the fact that it does not expressly exempt criminal laws from preëmption, as it does, for example, workers' compensation laws. The defendant cites the comparable saving clause in the federal Employee Retirement Income Security Act, 29 USC 1001 *et seq.,* as an example of how Congress would have indicated a desire to specifically save criminal laws from preëmption. Section 1144(b)(4) of that legislation exempts "any generally applicable criminal law of a State" from preëmption. There is no such provision in § 4(b)(4). The defendant also argues that § 4(b)(4) has consistently been interpreted to preserve existing workers' compensation and tort remedies, but not to create additional remedies for employees. See, e.g., *Pratico v Portland Terminal Co,* 783 F2d 255 (CA 1, 1985); *United Steelworkers of America v Marshall,* 208 US App DC 60; 647 F2d 1189 (1980), cert den 453 US 913 (1981).

When the broad language of § 4(b)(4), evidencing a general congressional intent to leave existing state common-law rules and statutes intact so far as possible, is considered along with the general presumption against preëmption discussed above, the conclusion that the § 18 jurisdictional requirements are to be read narrowly to preëmpt only unauthorized workplace standards, not the state's criminal laws, is inescapable.

C

IMPLIED PREËMPTION

The Court in *Hillsborough Co v Automated Medical Labs, Inc,* 471 US 707; 105 S Ct 2371; 85 L Ed 2d 714 (1985), narrowed the application of implied preëmption theory to two distinct situations. First, "Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation. *Rice v Santa Fe Elevator Corp,* 331 US 218, 230 [67 S Ct 1146; 91 L Ed 1447] (1947)." *Hillsborough,* p 713. Preëmption also may be inferred if the field sought to be preëmpted "is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' *Hines v Davidowitz,* 312 US 52, 67 [61 S Ct 399; 85 L Ed 581] (1941)." *Id.,* p 713.[20]

---

[20] Earlier decisions by the United States Supreme Court included a third theory of implied preëmption, in which "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose." *Rice v Santa Fe Elevator Corp, supra,* p 230. See also *Pacific Gas & Electric v Energy Resources Comm,* n 18 *supra; Fidelity Federal Savings & Loan Ass'n v De LaCuesta,* 458 US 141; 102 S Ct 3014; 73 L Ed 2d 664 (1982).

The Court in *Hillsborough* did not cite this language, perhaps

It cannot seriously be contended, with respect to this second theory of implied preëmption, that the federal interest in workplace health and safety outweighs the state's interests in this situation. Against that federal interest must be balanced not only the state's own—and in fact predominant—historical interest in the regulation of health and safety matters, *Hillsborough,* p 719 (citing *Rice v Santa Fe Elevator Corp, supra*), but also its traditional police powers interest in prosecuting criminal conduct. See *Knapp v Schweitzer,* 357 US 371; 78 S Ct 1302; 2 L Ed 2d 1393 (1958); *Patterson v New York,* 432 US 197; 97 S Ct 2319; 53 L Ed 2d 281 (1977).[21]

The defendant, however, does not argue the dominancy of the federal interest in this case. He argues instead that the comprehensiveness of the federal act evidences an intent on the part of Congress to "occupy the field" of workplace safety and health that would be undermined by allowing the application of state criminal laws in cases such as this. He contends that Congress has created a comprehensive regulatory scheme that is "unquestionably a clear, thorough set of guideposts for employers and employees" that leaves no room for state involvement, and that, in any event, the act's statutory scheme sets specific "standards" for criminal liability in this area, thus evidencing

determining that preëmption could no longer be found under such circumstances, or that the analysis was encompassed by the other cases cited. In any event, it appears that the Court is content with the general preëmption analysis summarized in *Hillsborough,* as evidenced by its substantial adoption of the same analysis more recently in *Schneidewind v ANR Pipeline Co,* 485 US 293; 108 S Ct 1145; 99 L Ed 2d 316 (1988).

[21] As the Court stated in *Patterson, supra,* "It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government, . . . and that we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States." *Id.,* p 201.

Congress' intent to occupy entirely at least that portion of the safety and health field.

There is no merit to the argument that we may infer from OSHA's broad scope a congressional intent to occupy the entire field of safety and health regulation or to exclude the states therefrom. The act itself clearly belies that conclusion, since, as discussed above, it preserves in § 18(a) the states' jurisdiction over issues for which there is no existing federal standard, and allows states in § 18(b), albeit with OSHA approval, to formulate their own standards for workplace safety and health. The act thus contemplates an active role by the states in all areas of regulation. Indeed, it actually encourages states "to assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws . . . ." 29 USC 651(b)(11).

The sheer length of the act, in our view, merely reflects the complexity of the subject matter. When considered in the context of that subject matter, the act's apparent comprehensiveness is not surprising. As the United States Supreme Court stated in *New York Dep't of Social Services v Dublino*, 413 US 405, 415; 93 S Ct 2507; 37 L Ed 2d 688 (1973), "The subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem . . . ."[22]

Despite its length and thoroughness, OSHA is far from complete. The incompleteness of OSHA's provisions for criminal penalties is but one example of

[22] See also *Hillsborough, supra,* pp 716-718; *R J Reynolds Tobacco Co v Durham Co,* 479 US 130, 149; 107 S Ct 499; 93 L Ed 2d 449 (1986) ("[p]reëmption should not be inferred, however, simply because the . . . regulations are comprehensive").

the incompleteness of the act as a whole, and serves to answer the defendant's second argument, that the inclusion of such sanctions within the act evidences Congress' intent to preëmpt at least that portion of the occupational safety and health field. The act itself contains only a few very minor criminal sanctions that can hardly be said to compose a comprehensive and exclusive scheme. Under § 17(e), a wilful violation of a specific OSHA standard that results in an employee's death is punishable by only up to six months' imprisonment. A similar violation that "only" seriously injures an employee carries no criminal penalties at all. A violation of the general-duty clause of § 5(a), even if it results in death, also carries no criminal penalty. Thus, as the Illinois Supreme Court concluded in *Chicago Magnet Wire, supra:*

> [I]t seems clear that providing for appropriate criminal sanctions in cases of egregious conduct causing serious or fatal injuries to employees was not considered. Under these circumstances, it is totally unreasonable to conclude that Congress intended that OSHA's penalties would be the only sanctions available for wrongful conduct which threatens or results in serious physical injury or death to workers. [*Id.,* 534 NE2d 967.]

Rather, as one author has concluded, "[t]he interpretation most consistent with the Act's goals is that Congress did not intend to preclude state penalties but rather [intended] to allow states to supplement OSHA penalties with their own sanctions." Note, *Federal OSHA preëmption, supra,* p 548.

D

CONFLICT PREËMPTION

Preëmption of state action lastly may be found if

a conflict exists between the state and federal laws. Such a conflict arises "when 'compliance with both federal and state regulations is a physical impossibility,' *Florida Lime & Avocado Growers v Paul,* 373 US 132, 142-143 [83 S Ct 1210; 10 L Ed 2d 248] (1963), or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines v Davidowitz, supra* at 67." *Hillsborough, supra,* p 713.

This case does not involve conflicting sets of regulations in the same area, making compliance with both a physical impossibility, as might happen, for example, when compliance with federal regulations necessarily violates state regulations.[23] The defendant argues only that criminal prosecutions other than under OSHA for conduct in the workplace "stand[ ] as an obstacle to the accomplishment and execution" of that act's purposes. *Hines v Davidowitz, supra,* p 67. The defendant argues in particular that allowing criminal prosecutions other than under OSHA would frustrate the goal of uniformity of sanctions for violations of the act. According to the defendant, the fact that states may already incorporate different criminal sanctions, with federal approval, into their own occupational safety and health legislation is burden enough on employers. To allow the states to also apply their own criminal laws, which obviously vary from state to state, to workplace conduct, would completely defeat the prospect of uniformity.

---

[23] The example of impossibility of dual compliance given by the Court in *Florida Lime & Avocado Growers, Inc, supra,* p 143, involved federal regulations forbidding the picking of any avocado containing more than seven percent oil, while a state regulation excluded any avocado with less than eight percent oil.

We are unpersuaded by this argument, since we are not convinced that uniformity of sanctions—or even of regulations, for that matter—was a significant concern of Congress when it adopted OSHA. In our view, "[t]he statute's purpose was to assure minimum—but not necessarily uniform—occupational health and safety standards." *Environmental Encapsulating Corp v New York City, supra,* p 59.[24] The fact that states are encouraged in the first section of the act to develop their own occupational safety and health standards, subject only to the condition in § 18(c)(2) that they be "at least as effective" as the federal standards, indicates that Congress was not primarily concerned with uniformity, but rather intended the federal act to provide a kind of "floor" of protection to employees. As the Court of Appeals for the Third Circuit stated in *United Steelworkers of America v Auchter, supra,* p 734, "[r]eduction of burdens posed by multiple state laws does not appear to have been a significant congressional concern; rather, Congress favored a uniform federal law so that those states providing vigorous protection would not be disadvantaged by those that did not." The application of this state's criminal laws to conduct in the workplace does not in our view present an obstacle to the accomplishment of OSHA's stated goal of assuring employees "safe and healthful working conditions."

---

[24] As the Court of Appeals for the Sixth Circuit stated in *Ohio Manufacturers' Ass'n v City of Akron,* 801 F2d 824, 831 (CA 6, 1986), "While the legislation and its history do illustrate that a national standard was felt to be essential to achieve the goals of the Act, they also indicate that this was to assure that the states would at least meet the minimum requirements of the federal standards, and not attempt to undercut each other." This conclusion is supported by the language and legislative history of § 18(c)(2) of the act, which requires that federally approved state plans be only "at least as effective" as the federal plan. *Id.*

E

The result we reach today is compelled by the Supremacy Clause preëmption analysis that has been established by the United States Supreme Court. Common sense likewise dictates this result. Consider the hypothetical example[25] in which an explosion occurs in a factory as a result of hazardous conditions amounting not only to a violation of a specific OSHA standard but also to criminal negligence. It could not seriously be contended in this situation that the prosecution under state criminal laws (such as a manslaughter statute) of the employer for the resulting deaths of his employees is preëmpted by OSHA's provision in § 17(e) of six months imprisonment for such a violation, while

---

[25] See "Getting away with murder in the workplace: OSHA's non-use of criminal penalties for safety violations," H R Rep No. 100-1051, 100th Cong 2d Sess (1988), p 10. This report, submitted by the House Committee on Government Operations, and based on a study by the Employment and Housing Subcommittee, reaches the same conclusions with respect to OSHA preëmption of state prosecutions for conduct in the workplace that we reach today:

> OSHA should take the position that the States have clear authority under the Federal OSH Act, as it is written, to prosecute employers for acts against their employees which constitute crimes under State law.
> Nothing in the OSH Act or its legislative history suggests that Congress intended to shield employers from criminal liability in the workplace or to preëmpt enforcement of State criminal laws of general application, such as murder, manslaughter, and assault. [Id., p 9.]

On the question of the states' interests in applying their general criminal laws to workplace conduct, the report observes:

> The States have an interest in controlling conduct that endangers the lives of their citizens whether it be at home, at work, or on the road. State and local prosecutors should be commended and encouraged to continue their efforts to protect people in their workplaces by utilizing the historic police power of the State to prosecute workplace injuries and fatalities as criminal acts. [Id., p 10.]

as to the deaths of any visitors, passersby, or members of the surrounding community, the state's ability to prosecute the employer as it sees fit is unaffected.

To take the hypothetical example one step further, suppose the employer actually intended to cause the deaths of his employees. Surely it could not be contended that, since the employer's act involved "conduct related to working conditions," *People v Chicago Magnet Wire, supra,* p 801, the state is precluded from charging the employer with murder, having instead to settle for a six-month prison term for a wilful violation of an OSHA standard. The difference between this hypothetical example and the case at bar is at most one of degree or of levels of criminal intent.

We do not believe that the inclusion by Congress of a few truly minor criminal sanctions within OSHA for "willful" violations of its standards, and only for those violations which actually result in death, evidences an intent to subordinate the traditional police powers of this state to the limited authority of the federal government to such an extent that the state is unable to enforce its laws against serious criminal conduct directed against its citizens. The mere fact that such conduct takes place in an employment setting, where there is a limited federal interest in protecting the safety and health of employees, is not sufficient to remove from the state its traditional authority and responsibility to protect the welfare of its citizens.[26]

---

[26] As the Wisconsin Court of Appeals stated in *State ex rel Cornellier v Black,* 144 Wis 2d 745, 755; 425 NW2d 21 (1988), "Wisconsin is not attempting to impose a penalty for violation of any safety regulations. It is only attempting to impose the sanctions of the criminal code upon one who allegedly caused the death of another person by reckless conduct. And the fact that that conduct may in some respects violate OSHA safety regulations does not abridge the state's historic power to prosecute crimes."

IV

CONCLUSION

Our decision on the preëmption question addressed by the Court of Appeals does not resolve this case, however. The prosecution's appeal in that Court initially concerned the circuit court's decision to quash the information against the defendant and dismiss the manslaughter charge. The Court of Appeals raised the preëmption issue sua sponte, requesting supplemental briefs from the parties. Since the Court of Appeals found that the prosecution was preëmpted by OSHA, it failed to reach the question whether the magistrate abused his discretion in binding over the defendant on the involuntary manslaughter charge for the reasons stated by the circuit judge. We therefore remand this case to the Court of Appeals for consideration of that issue.

The defendant in this case is charged with manslaughter, not simply with a "willful" violation of an OSHA standard. While his conduct, if proved, might also satisfy the elements of that "crime," the state has chosen, in a valid exercise of its police powers, to pursue this matter under its own criminal laws. We cannot construe OSHA, the stated purpose of which is "to assure so far as possible . . . safe and healthful working conditions and to preserve our human resources," as a grant of immunity to employers who are responsible for the deaths or serious injuries of their employees. We therefore reverse the decision of the Court of Appeals and remand the case to that Court for

consideration of those issues raised on appeal that it failed to consider.

RILEY, C.J., and LEVIN, BRICKLEY, CAVANAGH, ARCHER, and GRIFFIN, JJ., concurred with BOYLE, J.