# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

### DAVIS v BETMGM, LLC

Docket No. 166281. Argued April 10, 2025 (Calendar No. 2). Decided July 22, 2025.

Jacqueline Davis filed an action in the Wayne Circuit Court against BetMGM, LLC, asserting claims of fraud, conversion, and breach of contract. In 2021, plaintiff won more than $3 million over a six-day period while playing a game on defendant's internet gambling platform. Plaintiff requested a withdrawal of $100,000 from her internet gambling account, which defendant approved. By email, defendant congratulated plaintiff on her winnings and offered to coordinate fund-withdrawal options. Shortly after plaintiff withdrew the $100,000, defendant emailed plaintiff to inform her that her account had been suspended because of the "volume of play generated." Defendant investigated plaintiff's play history, determined that winnings had erroneously been credited to plaintiff's account because the game had malfunctioned on various plays, and refused to remit the winnings for that reason. Plaintiff first filed the circuit court action and then filed a "patron dispute form" with the Michigan Gaming Control Board (MGCB). Defendant moved for summary disposition in the circuit court action, arguing that plaintiff's claims were preempted by the Lawful Internet Gaming Act (LIGA), MCL 432.301 *et seq.*, and that the MGCB had exclusive jurisdiction over all online gambling disputes. While the motion for summary disposition was pending, the MGCB notified plaintiff that it was investigating her patron dispute, but that any investigation conducted by the MGCB was "not intended to make a determination on the merits of any outstanding dispute or litigation between an authorized participant and the internet gaming operator and its internet gaming platform provider and accordingly should not be used for such purposes," and that the MGCB had "no authority to award any money or other relief directly to an authorized participant." Plaintiff relied on the MGCB's letter in opposing defendant's motion for summary disposition; plaintiff additionally argued that her claims were not inconsistent with the LIGA such that her claims would be prohibited under MCL 432.304(3), which provides that "[a] law that is inconsistent with this act does not apply to internet gaming as provided for by this act." The circuit court deferred a decision on the motion and sought clarification from the MGCB regarding its authority and jurisdiction over this dispute. Relevant here, the MGCB, through Assistant Attorney General Mark Sands, informed both parties that when the MGCB finds a violation of the LIGA, the MGCB may direct a licensee to take any corrective action the MGCB considers appropriate; however, Sands stated that the MGCB does not determine the validity of a dispute between an authorized participant and the licensee and does not have authority to adjudicate such a dispute. David Murley, Deputy Director of the MGCB's Online Gaming and Legal Affairs Division, then sent plaintiff a letter in which he referred to

Sands's letter and reaffirmed that the MGCB's investigations into patrons' complaints were "not intended to determine the merits of any outstanding dispute or litigation between an authorized participant and the internet gaming operator . . . ." That same day, the MGCB informed defendant that it had decided not to pursue disciplinary action even though defendant had violated administrative rules by failing to notify the MGCB immediately of the game malfunction and by failing to fully cooperate with the investigation into plaintiff's patron complaint. The court, Annette J. Berry, J., subsequently granted defendant's motion for summary disposition, reasoning that the LIGA preempted plaintiff's claims. In reaching that conclusion, the circuit court cited caselaw interpreting the Michigan Gaming Control and Revenue Act (MGCRA), MCL 432.201 *et seq*., as well as several administrative rules that had been issued in accordance with the LIGA, reasoning that the LIGA, like the MGCRA, similarly established "an all-inclusive preemption clause that precludes inconsistent common-law claims." The court later denied plaintiff's motion for reconsideration. Plaintiff appealed, and in a split published decision, the Court of Appeals, BOONSTRA, P.J., and LETICA, J. (FEENEY, J., dissenting), affirmed the circuit court's dismissal of plaintiff's complaint. The reasoning of the majority largely tracked that of the circuit court. Judge FEENEY would have reversed the circuit court's order, relying on Murley's letter to plaintiff and distinguishing the cited caselaw to support her conclusion. Judge FEENEY further questioned the majority's reliance on MCL 432.309, which sets forth the authority of the MGCB, concluding that a dispute involving a patron seeking a remedy in tort or contract did not come within the MGCB's jurisdiction. Plaintiff sought leave to appeal, and the Supreme Court granted the application. 513 Mich 1104 (2024).

In a unanimous opinion by Justice ZAHRA, the Supreme Court *held*:

When the Legislature enacts statutes that may preclude common-law claims that are inconsistent with the enacted state law, the relevant question is whether the common law was abrogated by the statute, not whether the claims were preempted by the statute. There is no clear indication that the Legislature intended the LIGA to abrogate common-law claims of fraud, conversion, and breach of contract relating to a gambling dispute between a patron and an online gaming licensee. These common-law claims are also not inconsistent with the LIGA so as to be prohibited by MCL 432.304(3). The Court of Appeals erred by holding that the LIGA preempted plaintiff's common-law claims and that those claims were inconsistent with the LIGA such that they were prohibited by MCL 432.304(3). The judgment of the Court of Appeals affirming the circuit court's grant of summary disposition to defendant was reversed, and the case was remanded to the circuit court for further proceedings.

1. In addressing whether a statutory scheme preempted common law, the Supreme Court's previous treatment of preemption in the same manner as whether a statutory scheme amends or repeals the common law, and its use of the terms "preemption" and "abrogation" interchangeably, was incorrect, although this was a harmless aberration that did not affect the substance of its rulings. A state statute does not "preempt" the common law; instead, the correct principle to apply in this context is abrogation. The Legislature may only preempt local laws. When it enacts statutes that may preclude common-law claims that are inconsistent with the enacted state law, the question is whether the common law was abrogated by the statute, not whether the Legislature has preempted those claims.

2. The Legislature may alter or abrogate the common law through its legislative authority. It is presumed that the Legislature knows of the existence of the common law when it acts, and the Legislature should speak in no uncertain terms when it exercises its authority to modify the common law. Thus, the first inquiry regarding this question is whether the Legislature intended to abrogate the common law. Under the common law, gambling was prohibited, and if a person lost money gambling, courts would not intervene to help the person recover their losses unless there was a statute allowing such recovery. Given that the LIGA allows individuals to lawfully engage in online gambling, the Legislature clearly intended to abrogate some aspects of Michigan's common law, namely, any common-law rules premised on the assumption that gambling is unlawful. It was less clear whether the Legislature, by providing a right to gamble online, intended to abrogate common-law claims in circuit court that relate to a gambling dispute between a patron and a licensee. As applied to this case, there was no basis to conclude that the Legislature intended to abrogate claims of fraud, conversion, and breach of contract because (1) the LIGA does not mention the common law and (2) the Legislature was presumed to know of these existing common-law claims that would apply with equal force just as in any dispute over a lawful transaction. Accordingly, there was no clear indication that the Legislature intended the LIGA to abrogate plaintiff's common-law claims of fraud, conversion, and breach of contract, and the Court of Appeals, which addressed the issue as one of preemption, erred by holding otherwise.

3. MCL 432.304(3) provides that "[a] law that is inconsistent with [the LIGA] does not apply to internet gaming as provided for by this act." The comprehensiveness of the LIGA's statutory scheme by itself was not dispositive of the question of "inconsistency." Instead, a more distinct inquiry was required with the proper question being whether plaintiff's common-law claims in fact conflicted with specific statutory and regulatory authority exercised by the MGCB. Stated differently, the correct focus was whether the MGCB's exercise of authority, as permitted by the LIGA, resulted in defendant, as a licensee, obtaining immunities and rights derived from the MGCB's actions. Relevant to this inquiry, MCL 432.305(1) assigns to the MGCB specific powers and duties defined by the act "and all other powers necessary to enable [the MGCB] to fully and effectively execute [the LIGA] to administer, regulate, and enforce the system of internet gaming established under [the LIGA]." In turn, MCL 432.309 sets forth a list of the MGCB's authority and powers; the list indicates that the MGCB has broad authority over the licensing of online casinos, the establishment of rules by which the licenses are obtained or revoked, casino operations, and procedures for sanctioning online casinos that violate the LIGA and its rules. However, MCL 432.309 does not grant the MGCB the authority, much less impose on it an obligation, to resolve a dispute between an individual patron and a licensee. Mich Admin Code, R 432.641(7) provides that when a complaint is filed against an internet gaming operator, the MGCB may conduct any investigation it deems necessary and may direct the operator to take any corrective action the MGCB considers appropriate. Given the use of the word "may," the MGCB has discretion whether to act under Rule 432.641(7), so plaintiff's common-law claims were not "inconsistent" with a statutory scheme that confers on the MGCB discretion to take corrective action, particularly when the MGCB expressly disclaimed any role in resolving the merits of disputes between patrons and gaming providers. In other words, simply because the MGCB *may* take corrective measures on some matters under the LIGA does not mean that the MGCB is *required* to take corrective measures on all matters to resolve a dispute between a patron and licensee. Considering this statutory scheme, other than Rule 432.641(7) allowing the MGCB to direct an operator or provider to take "corrective action" to resolve a dispute between a patron and

licensee, there was no indication in the LIGA that the MGCB had authority to resolve the dispute in this case. Accordingly, plaintiff's claims were not inconsistent with the LIGA so as to be prohibited by MCL 432.304(3), and the Court of Appeals erred by concluding otherwise.

Court of Appeals judgment affirming the circuit court's grant of summary disposition to defendant reversed, and case remanded to the circuit court for further proceedings.

Justice HOOD did not participate because the Court considered this case before he assumed office.

OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED July 22, 2025

STATE OF MICHIGAN

SUPREME COURT

JACQUELINE DAVIS,

      Plaintiff-Appellant,

v                            No. 166281

BETMGM, LLC,

      Defendant-Appellee.

BEFORE THE ENTIRE BENCH (except HOOD, J.)

ZAHRA, J.

This Court is asked to decide whether plaintiff, Jacqueline Davis, a patron of defendant, BetMGM, LLC, an online gaming licensee, may bring a cause of action in circuit court alleging common-law claims for breach of contract, conversion, and fraud regarding a dispute over alleged winnings that defendant refused to remit because the game

had allegedly malfunctioned "on various plays"[1] and erroneously credited winnings to her account. Defendant maintains that the Lawful Internet Gaming Act (LIGA), MCL 432.301 *et seq*., is a comprehensive statutory scheme that is exclusively regulated and enforced by the Michigan Gaming Control Board (MGCB),[2] thus abrogating and ostensibly preempting plaintiff's common-law claims. In defendant's view, the MGCB has exclusive jurisdiction over any dispute related to online gambling, and the circuit court lacks subject-matter jurisdiction to decide all gambling disputes.

The LIGA defines "[i]nternet game," in part, as "a game of skill or chance that is offered for play through the internet in which an individual wagers money or something of monetary value for the opportunity to win money or something of monetary value."[3] There is no question that the Legislature intended to abrogate some aspects of Michigan's common law when enacting the LIGA, which allows individuals to lawfully engage in online gambling. Previously, legal actions premised on gambling transactions were not enforceable under Michigan's common law,[4] and the Legislature later enacted statutes

---

[1] Defendant provided plaintiff with a spreadsheet identifying how the game malfunctioned in 2.5% of her plays, in each instance improperly inflating her account balance.

[2] MCL 432.305(1); MCL 432.303(e). See MCL 432.204 (creating the MGCB under the Michigan Gaming Control and Revenue Act (MGCRA), MCL 432.201 *et seq*.).

[3] MCL 432.303(q).

[4] *Gregory v Wendell*, 39 Mich 337, 341-344 (1878). "At the common law, one who lost money in prohibited gaming or betting could not recover, the rule, in the absence of statute, being that the law will leave the parties *in pari delicto* where it finds them." *Lassen v Karrer*, 117 Mich 512, 512; 76 NW 73 (1898); see also *Helber v Schantz*, 109 Mich 669, 669-670; 67 NW 913 (1896) (stating that the plaintiff could not maintain a suit to recover winnings because "what occurred between the parties was a gaming transaction, and . . . courts will not interfere in behalf of a party to such a transaction").

2

consistent with our common law and public policy to criminalize gambling[5] and void contracts related to gambling.[6]

Somewhat less clear is whether the Legislature, by providing a right to gamble online, intended to abrogate common-law claims in circuit court that relate to a gambling dispute between a patron and a licensee. We clarify that the first question presented in this case is one of abrogation. We must ask whether the Legislature intended to abrogate the common-law claims asserted by plaintiff against defendant, the host of an online casino. Applying the well-established law of abrogation to this case, we hold that there is no clear indication that the Legislature intended the LIGA to abrogate the common-law claims raised in this litigation.

The text of the LIGA also directs us to consider whether plaintiff's common-law claims assert "[a] law that is *inconsistent* with [the LIGA, such that it] does not apply to internet gaming as provided for by this act."[7] Resolving this question requires a comprehensive review of the statutory scheme.

The LIGA assigns to the MGCB specific powers and duties defined in the act "and all other powers necessary to enable [the MGCB] to fully and effectively execute [the

---

[5] See, e.g., MCL 750.301 and MCL 750.310d; see also MCL 750.314.

[6] MCL 600.2939(3).

[7] MCL 432.304(3) (emphasis added). We do not believe that the phrase "[a] law" in this statute is dispositive here. Even if we were to conclude that this language includes common-law claims, plaintiff's common-law claims could nonetheless be maintained if they are not "inconsistent" with the LIGA.

3

LIGA] to administer, regulate, and enforce the system of internet gaming established under [the LIGA]."[8]

Under the statutory scheme, the MGCB exercises its powers and duties under the LIGA and licensees, such as defendant, receive specific correlating immunities and rights because of the MGCB's actions. Thus, the focus of the inquiry is not, as the Court of Appeals majority held, whether plaintiff's claims merely "conflict with the MGCB's authority under [the] LIGA to regulate all aspects of Internet gaming."[9] Instead, we consider whether plaintiff's claims in fact conflict with specific statutory and regulatory authority granted to the MGCB under the LIGA.

The proper focus is whether the MGCB's exercise of authority, as permitted by the LIGA, results in a licensee obtaining immunities and rights derived from the MGCB's actions. Under this scheme, a disgruntled patron may not bring an action against a licensee if the MGCB has exercised its statutory authority to render a decision that is incompatible with those claims. Here, however, the MGCB cannot make a decision that is incompatible with plaintiff's common-law claims, and defendant has not shown that the MGCB is obligated to take action that could render plaintiff's claims incompatible with the LIGA.

Defendant does not direct us to a comprehensive statutory scheme that supports its position. Instead, defendant cites Mich Admin Code, R 432.641 to argue that plaintiff's common-law causes of action are only actionable in accordance with the procedures stated in the LIGA. Relevant here, Rule 432.641(7) merely provides that, upon the filing of a

---

[8] MCL 432.305(1).

[9] *Davis v BetMGM, LLC*, 348 Mich App 402, 416; 19 NW3d 138 (2023).

4

complaint against an internet gaming operator, the MGCB may direct the operator to take any corrective action the MGCB deems appropriate.[10]  Rule 432.641 does not carry the day for defendant.  Simply because the MGCB *may* take corrective measures on some matters under the LIGA does not mean that the MGCB is *required* to take corrective measures on all matters to resolve a dispute between a patron and licensee.  Further, that the MGCB *may* act does not indicate that a complaint filed with the MGCB constitutes the exclusive remedy for an aggrieved consumer of online gambling activity.  Accordingly, we reverse the lower courts' decisions and remand to the circuit court for further proceedings consistent with this opinion.

## I.  BASIC FACTS AND PROCEEDINGS

Plaintiff opened an internet gambling account with defendant.  This case arises from plaintiff's play on defendant's internet gambling platform over a six-day period.  On March 18, 2021, plaintiff deposited $50 into her BetMGM account and made her first wager in the amount of $4.50 on a game titled "Luck O' the Roulette."  Plaintiff lost her first wager, but she continued to play the game and, after each play, her BetMGM account would reflect either a credit for her winnings or a reduction for her losses.  In gambler's parlance, plaintiff

---

[10] Rule 432.641(7) provides:

> On receipt of a complaint from an authorized participant or notification of an unresolved complaint from an internet gaming operator or internet gaming platform provider, the board may conduct any investigation the board considers necessary and may direct an internet gaming operator or internet gaming platform provider to take any corrective action the board considers appropriate.

5

went on a "heater"[11] of epic magnitude. As her account balance grew, she pressed her bets. By the end of her first day of play, plaintiff's wagers had increased to $150 per play, and her account reflected a balance of $20,077.74. Plaintiff did not participate in internet gambling on March 20, 2021, but her gambler's intuition returned to the Luck O' the Roulette game the following day and her heater continued. As her winnings grew, so too did the amount she wagered per play. By March 23, 2021, plaintiff's wagers had increased to $5,000 per play and her account reflected a balance of $3,289,500.75.

On March 21, 2021, plaintiff requested a withdrawal from her account in the amount of $100,000, which defendant approved. On March 22, 2021, plaintiff received an email from "Nate," a member of the VIP Team at BetMGM. Nate congratulated plaintiff on her winnings and offered to coordinate fund-withdrawal options.

After plaintiff executed her withdrawal, she received an email from defendant indicating that her account had been suspended "given the volume of play generated." The email further indicated that defendant believed "there was an error in the underlying game play" and that plaintiff's account was under review.

On April 12, 2021, Jeremy Kolman, defendant's Director of Legal Affairs, wrote a letter to David Steingold, an attorney retained by plaintiff. The letter stated:

> On March 21st, 22nd and 23rd 2021, BetMGM Casino Operations Team identified unusual activity and an improbable balance associated with Ms. Davis's account. Per company policy, all unusual activity is flagged for review and Ms. Davis's account was suspended subject to an internal investigation. The subsequent investigation revealed a malfunction of the

---

[11] The term "heater" is used to describe a gambling win streak. Sportsbook Review, *Sports Betting Glossary* <https://www.sportsbookreview.com/how-to-bet-on-sports/betting-terms-glossary/> (accessed July 10, 2025) [https://perma.cc/M6QM-KVJ3].

6

game in question, Luck O' the Roulette that resulted in certain win amounts being multiplied when transferred from the onscreen balance to the patron's wallet. This resulted in an inaccurate and inflated amount being awarded to Ms. Davis's wallet despite Ms. Davis not actually winning that amount in the game.

Per BetMGM's Terms and Conditions, in the event of such a malfunction BetMGM "will seek to place all parties directly affected by such Error in the position they were in before the Error occurred[]" and "reserve[s] the right [to] declare null and void any wagers or bets that were the subject of such Error and to take any money from [the patron's] Account relating to the relevant bets or wagers[.]" . . .

The results of BetMGM's investigation are reflected in the attached spreadsheet detailing Ms. Davis's play history. The spreadsheet identifies Ms. Davis's rounds of play, the "Correct Wallet" (column G), and the "Wrong Wallet" (column K) that resulted from the malfunction. The first malfunction occurred on Ms. Davis's 28th turn when she wagered $8.70 (Column F), won $12.25 (Column I), but due to the game malfunction was credited an additional $33.24 (Column M), for an incorrect account balance of $87.94 (Column N). This error continued to occur throughout Ms. Davis's gameplay resulting in the inflated balance to her account. Absent this error, Ms. Davis's account would have gone to zero approximately around her 368th turn and she would not have been able to continue playing without depositing additional funds.

Pursuant to the relevant Michigan Gaming Laws and Regulations, Luck O' the Roulette has since been removed from the Michigan market and the Michigan Gaming Control Board was notified of the malfunction.[12]

Plaintiff filed this action in circuit court in June 2021. In her complaint and in the amended complaint filed the following month, plaintiff alleged common-law claims for fraud, conversion, and breach of contract. Between the time of the filing of her original and amended complaints, plaintiff, through her attorney, filed with the MGCB a grievance or complaint that has been referred to in this record as a "patron dispute form."

---

[12] First, second, and fourth alterations in original.

7

On July 15, 2021, in lieu of filing an answer to plaintiff's complaint, defendant moved to dismiss under MCR 2.116(C)(4). In relevant part, defendant argued that the circuit court lacked subject-matter jurisdiction over this dispute. Defendant asserted that plaintiff's claims were preempted by the LIGA and its administrative rules and that the MGCB had exclusive jurisdiction over online gambling disputes.

While defendant's motion to dismiss was still pending in the circuit court, David Hicks, the iGaming Manager for the Online Gaming and Legal Affairs Division of the MGCB, sent a letter to plaintiff on July 28, 2021, stating:

> The Michigan Gaming Control Board (Board) has received a Patron Dispute Form which described certain problems you recently encountered with BetMGM Online Casino. Your complaint is important to the Board because the complaint process is helpful in identifying possible violations of the Michigan Lawful Internet Gaming Act and Administrative Rules.

> The Lawful Internet Gaming Act (R432.641(7)) authorizes the Board to conduct any investigation it deems necessary as well as direct a gaming operator or internet gaming platform to take corrective action that the Board considers appropriate. *Any investigation conducted by the Board is not intended to make a determination on the merits of any outstanding dispute or litigation between an authorized participant and the internet gaming operator and its internet gaming platform provider and accordingly should not be used for such purposes. Furthermore, the Board has no authority to award any money or other relief directly to an authorized participant.*

> The Board received your patron dispute form, prepared by your attorney David Steingold, on July 6, 2021. Specifically, your complaint arises from the following event, which was detailed in the addendum of the patron dispute form:

> From March 18 through March 23, 2021, Ms. Davis played Luck O' the Roulette on BetMGM's online gaming site. During this play, Ms. Davis' account showed she had won $3,288,616.42. BetMGM allowed her to withdraw $100,000 from her account but is now stating there was a malfunction with the game and is not allowing her to withdraw any other funds from her account.

The matters you describe are subject to regulation under the Michigan Lawful Internet Gaming Act or the Administrative Rules promulgated pursuant thereto. The Board may only investigate whether a specific violation of the Michigan Lawful Internet Gaming Act and the related administrative rules has occurred. [Emphasis added.]

Plaintiff attached the letter as an appendix to her reply to defendant's motion to dismiss. Plaintiff cited a provision of the LIGA, MCL 432.304(3), which provides that "[a] law that is inconsistent with this act does not apply to internet gaming as provided for by this act." Plaintiff argued that the common-law claims asserted in this case were not inconsistent with the LIGA.

The circuit court heard oral arguments on defendant's motion to dismiss on December 8, 2021. At that hearing, the parties disputed whether the MGCB had jurisdiction over the common-law claims alleged by plaintiff. Plaintiff cited the Hicks correspondence as evidence that the MGCB had no authority to address, resolve, or provide plaintiff with a remedy for the alleged wrongs imposed on plaintiff. Defendant argued that, following an investigation into a patron's complaint, the MGCB could "take any corrective action the board considers appropriate," under Rule 432.641(7). The circuit court deferred a decision on defendant's motion to dismiss and sought clarification from the MGCB as to its authority and jurisdiction over this dispute.

On January 24, 2022, Mark Sands, an Assistant Attorney General in the Alcohol and Gambling Enforcement Division, sent an email to counsel for both parties. Sands's email addressed the MGCB's patron-complaint process initiated by plaintiff's attorney:

Upon the receipt of a patron complaint, an investigation, and the finding of a violation of the Act or Rules, the Board may direct a licensee to take any corrective action the board considers appropriate. But what the Board does not do is determine the validity of a dispute between the authorized participant and the licensee. That is, the determination that a licensee has or

9

has not violated the Act or Rules is not an adjudication on the merits of the underlying authorized participant/licensee dispute because the Board does not have the authority to adjudicate such a dispute.

On February 10, 2022, David Murley, Deputy Director of the MGCB's Online Gaming and Legal Affairs Division, corresponded with plaintiff and her attorney. Murley's letter expressly referred to Sands's January 24, 2022 email, reaffirming that the MGCB's investigations into patron complaints are "not intended to determine the merits of any outstanding dispute or litigation between an authorized participant and the internet gaming operator . . . ." The correspondence stated that the MGCB would be investigating plaintiff's complaint but that the investigation was limited to determining only "whether there was a violation by Bet MGM [sic] of the Act and Rules" and "if so, the appropriate remedy for such violation . . . ."

Murley also sent correspondence dated February 10, 2022, to Adam Greenblatt, defendant's Chief Executive Officer, notifying defendant that the MGCB's investigation of plaintiff's patron complaint revealed that defendant violated two rules promulgated by the MGCB. First, defendant was required, under Mich Admin Code, R 432.632b(2), to notify the MGCB immediately of "any defects or malfunctions of the internet gaming platform . . . ." According to the MGCB's findings, defendant became aware of the purported malfunction in the Luck O' the Roulette game several days before it notified the MGCB. This late notification constituted a violation of Rule 432.632b(2). The letter also noted that defendant had not fully cooperated with the MGCB's investigation into plaintiff's patron complaint, in violation of another administrative rule, Mich Admin Code, R 432.632a. Murley concluded by noting that, despite these two violations, the MGCB had decided not to take formal disciplinary action against defendant.

10

On May 5, 2022, the circuit court conducted a second hearing on defendant's motion to dismiss. At the conclusion of that second hearing,[13] the court indicated that it would take the motion under advisement.

On June 29, 2022, the circuit court issued a written opinion and order, granting summary disposition to defendant. The court noted "the dearth of authority interpreting [the] LIGA" and looked to previous caselaw addressing the Michigan Gaming Control and Revenue Act (MGCRA), MCL 432.201 *et seq.*, for guidance in resolving the issues presented. The MGCRA contains a provision, MCL 432.203(3), that specifies that "[a]ny other law that is inconsistent with this act does not apply to casino gaming as provided for by this act." Because this provision is very similar to a provision in the LIGA, MCL 432.304(3), the circuit court looked for guidance from two published decisions of the Court of Appeals interpreting the MGCRA, *Papas v Gaming Control Bd*[14] and *Kraft v Detroit Entertainment, LLC*.[15] Relying on the analysis provided by those decisions, the circuit

---

[13] At this hearing, neither plaintiff nor her counsel was aware of Murley's February 10, 2022 letter to Greenblatt, which documented the MGCB's finding that defendant had violated two administrative rules. Further, counsel for defendant argued at the hearing that,

> even if the Court did have jurisdiction, it is appropriate for the Gaming Control Board [to have] the opportunity to look at this matter first and make whatever decisions they choose to make, rather than this Court potentially having alternative views or conflicting decisions.

Nonetheless, the circuit court considered this document after plaintiff's counsel obtained a redacted version of the letter through a request made under the Freedom of Information Act, MCL 15.231 *et seq.*, which plaintiff attached to a later filed motion for reconsideration.

[14] *Pappas v Gaming Control Bd*, 257 Mich App 647; 669 NW2d 326 (2003).

[15] *Kraft v Detroit Entertainment, LLC*, 261 Mich App 534; 683 NW2d 200 (2004).

11

court concluded that the LIGA similarly "establishes an all-inclusive preemption clause that precludes inconsistent common-law claims." Citing *Kraft* and several administrative rules that have been issued in accordance with the LIGA,[16] the circuit court observed that "the Legislature sought to avoid conflicting standards regarding the implementation and enforcement of internet gaming by preempting inconsistent laws." On that basis, the circuit court concluded that plaintiff's common-law claims were preempted.

Plaintiff appealed that decision in the Court of Appeals. In a split published decision, the Court of Appeals affirmed the trial court's order granting summary disposition in favor of defendant. The majority opinion largely tracked the circuit court's analysis and relied on the same caselaw and many of the same administrative rules to support its decision. In her dissent, Judge FEENEY took a different approach, relying on Murley's letter to plaintiff, which explicitly stated that " 'MGCB investigations are not intended to determine the merits of any outstanding dispute or litigation between an authorized participant and the internet gaming operator . . . .' "[17]

Judge FEENEY distinguished the caselaw on which the Court of Appeals majority and the circuit court relied to reach their conclusions. Most significantly, Judge FEENEY explained that the plaintiff in *Kraft* alleged that the slot machines on which she lost substantial amounts of money were misleading. But the *Kraft* Court observed that the MGCB approved all aspects of those slot machines, including their appearance, for use in

---

[16] Specifically, Rule 432.632b(2) and (4)(b); Mich Admin Code, R 432.639(2)(a)(i)(E); Mich Admin Code, R 432.639c(8); Mich Admin Code, R 432.645; Mich Admin Code, R 432.652(1)(l); Mich Admin Code, R 432.663(2)(a); Mich Admin Code, R 432.668(1)(a); and Rule 432.641.

[17] *Davis*, 348 Mich App at 419-420 (FEENEY, J., dissenting) (ellipsis in *Davis*).

12

Michigan casinos. Judge FEENEY asserted that *Kraft* was distinguishable from the present case. In *Kraft*, the "Court determined that the plaintiff could not maintain a claim based on an argument that, at its core, maintains that the MGCB should not have approved th[ese] particular slot machine[s] for use in a Michigan casino."[18] Judge FEENEY contrasted *Kraft* and noted that "[t]he case before us, however, is not based on a claim that plaintiff was lured into playing 'Luck O' the Roulette' because [the appearance of the game was deceptive and plaintiff] was misled into believing that her chances of winning were greater than what they actually were. Rather, it is based on a claim that defendant's platform informed her that she had won, that she had won a specific amount, and that defendant then refused to pay her the winnings."[19]

Judge FEENEY also questioned the majority's reliance on MCL 432.309, which sets forth the authority of the MGCB. While Judge FEENEY agreed that the statute provides an exhaustive list of the MGCB's authority, she observed that

> a review of that list reflects extensive authority over the licensing of online casinos, an establishment of rules by which those licenses are obtained (and perhaps revoked), casino operations, and procedures for sanctioning online casinos that violate the statute and rules. What is not found in the list is the authority, much less the obligation, to resolve individual patron disputes such as those presented here.[20]

Judge FEENEY concluded that, "while licensing issues, including administrative disciplinary actions against a licensee, come within the MGCB's exclusive jurisdiction,

---

[18] *Id*. at 422.

[19] *Id*. at 422-423.

[20] *Id*. at 423.

13

disputes by a patron seeking a remedy in tort or contract do not come within the MGCB's jurisdiction."[21]

Plaintiff sought leave to appeal in this Court. We granted the application and scheduled oral argument to address whether

> (1) each of the plaintiff's common law claims is inconsistent with and preempted by the [LIGA], such that the Wayne Circuit Court lacked subject matter jurisdiction over this action; and (2) the [MGCB] has jurisdiction, exclusive or otherwise, over common law claims regarding contract or account disputes, and if so, what statutes or administrative rules govern its resolution of the dispute.[22]

## II. ANALYSIS

### A. STANDARD OF REVIEW

We review de novo a circuit court's resolution of a motion for summary disposition.[23] Our review of this matter also requires us to interpret and apply the LIGA and determine whether the LIGA abrogated or preempted the common law. Questions of law such as these are also subject to review de novo.[24]

### B. CLARIFYING PREEMPTION AND ABROGATION

In the legal context, "preemption" generally refers to "[t]he principle (derived from the Supremacy Clause) that a federal law can supersede or supplant any inconsistent state

---

[21] *Id*. at 426.

[22] *Davis v BetMGM, LLC*, 513 Mich 1104, 1104-1105 (2024).

[23] *Veenstra v Washtenaw Country Club*, 466 Mich 155, 159; 645 NW2d 643 (2002).

[24] *Murphy v Inman*, 509 Mich 132, 143; 983 NW2d 354 (2022).

14

law or regulation."[25]  In some instances, "a federal statute's preemptive force may be so extraordinary and all-encompassing that it converts an ordinary state-common-law complaint into one stating a federal claim for purposes of the well-pleaded-complaint rule."[26]  Some of these principles have translated to state courts' jurisprudence deciding their own laws' preemptive force.  Perhaps the most common application of preemption in that context is "obstacle preemption," also termed "conflict preemption," which refers to "[t]he principle that a federal or *state statute can supersede or supplant* state or *local law* that stands as an obstacle to accomplishing the full purposes and objectives of the overriding federal or state law."[27]

Michigan courts have long acknowledged that Michigan's statutes or its common law may be preempted by operation of federal law under the Supremacy Clause of the United States Constitution, US Const, art VI, cl 2.[28]  Likewise, this Court has clearly

---

[25] *Black's Law Dictionary* (12th ed) (defining "preemption").

[26] *Id*. (defining "complete-preemption doctrine").

[27] *Id*. at 1427 (defining "obstacle preemption").

[28] See, e.g., *People v Hegedus*, 432 Mich 598; 443 NW2d 127 (1985) (analyzing whether the federal Occupational Safety and Health Act, 29 USC 651 *et seq*., preempted a state prosecution for a death that occurred in the workplace); *Ryan v Brunswick Corp*, 454 Mich 20; 557 NW2d 541 (1997) (examining whether the plaintiff's claims were preempted by the Federal Boat Safety Act, 46 USC 4301 *et seq*.), abrogated by *Sprietsma v Mercury Marine*, 537 US 51, 55 & n 3, 63-64 (2002); *Arbuckle v Gen Motors LLC*, 499 Mich 521; 885 NW2d 232 (2016) (analyzing whether the plaintiff's claim was preempted by 29 USC 185(a) of the federal Labor Management Relations Act); *Abela v Gen Motors Corp*, 257 Mich App 513, 525; 669 NW2d 271 (2003) (holding that because the Federal Arbitration Act, 9 USC 1 *et seq*., preempts Michigan's lemon law, MCL 257.1401 *et seq*., the plaintiffs' lemon-law claim should have been resolved through binding arbitration); *Martinez v Ford Motor Co*, 224 Mich App 247; 568 NW2d 396 (1997) (holding that the

15

embraced the principle of "conflict preemption" in its own right, by holding, in several

cases, that a state statute can supersede local law or regulation.[29]

In the past this Court has also referred to the "preemption" of common-law claims

by a state statute.[30]  In this context, our usage of the term "preemption" is something of a

misnomer.[31]  That is, in cases addressing whether a statutory scheme preempted the

plaintiff's state common-law tort claims were preempted by the National Motor Vehicle
Safety Act, 15 USC 1381 *et seq*.).

[29] *Mich Gun Owners, Inc v Ann Arbor Sch*, 502 Mich 695; 918 NW2d 756 (2018)
(analyzing the effect of state law regulating firearms use, MCL 123.1101 *et seq*., on school
districts' bans on guns on school property); *DeRuiter v Byron Twp*, 505 Mich 130; 949
NW2d 91 (2020) (holding that the Michigan Medical Marihuana Act, MCL 333.26421 *et
seq*., did not preempt the defendant township's local zoning law that limited where medical
marijuana could be cultivated); *People v Llewellyn*, 401 Mich 314; 257 NW2d 902 (1977)
(holding that the local municipality's ordinance regulating obscene materials was
unconstitutional because the subject was preempted by Michigan's criminal antiobscenity
statutes, MCL 750.343a *et seq*.).

[30] See, e.g., *Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 80; 711 NW2d 340
(2006) (holding that the adoption of MCL 440.3311 "preempt[ed] the common law on
accord and satisfactions in the area of negotiable instruments"); *Wold Architects &
Engineers v Strat*, 474 Mich 223, 225; 713 NW2d 750 (2006) (holding that Michigan's
adoption of statutory arbitration did not preempt common-law arbitration); *Anderson v
Pine Knob Ski Resort, Inc*, 469 Mich 20, 27 n 2; 664 NW2d 756 (2003) (holding that the
Ski Area Safety Act, MCL 408.321 *et seq*., preempted a common-law claim of premises
liability); *Jackson v PKM Corp*, 430 Mich 262, 279; 422 NW2d 657 (1988) (holding, under
former MCL 436.22, that the then-applicable "dramshop act . . . afford[ed] the exclusive
remedy for injuries arising out of an unlawful sale, giving away, or furnishing of
intoxicants thereby preëmpting all common-law actions arising out of these
circumstances"); *Millross v Plum Hollow Golf Club*, 429 Mich 178, 181; 413 NW2d 17
(1987) (holding that the "plaintiff's negligence claim which arose out of the selling, giving,
or furnishing of alcoholic liquor by a liquor licensee is preëmpted by the exclusive remedy
of the dramshop act").

[31] *Kraft*, 261 Mich App at 544 n 5 (acknowledging that "preemption" may be something of
a misnomer when referring to this situation yet being bound to use the term preemption to
describe preclusion of the plaintiff's common-law claims).

common law, this Court has treated preemption in the same manner as whether a statutory scheme amends or repeals the common law.[32]  This is not correct.  The misnomer appears to have originated in *Millross v Plum Hollow Golf Club*.  *Millross* cited a decision of the Supreme Court of the United States for the proposition that "[w]hether or not a statutory scheme preëmpts the common law on a subject is a matter of legislative intent."[33]  But that case, *Jones v Rath Packing Co*, concerned whether Congress, in enacting various federal statutes related to meat packaging and labeling, intended to preempt state statutes regulating similar subjects.[34]

We clarify today that, contrary to *Millross,* a state statute does not "preempt" the common law.  The correct principle to apply in this context is *abrogation*.  Though we have used the terms "preemption" and "abrogation" interchangeably in the past,[35] this was an aberration, but one that is harmless in hindsight and does not affect the substance of our rulings.  Our Legislature may only preempt local laws.  When it enacts statutes that preclude common-law claims that may be inconsistent with the enacted state law, the question is not whether the Legislature has preempted those claims.  Instead, the question is whether the common law was abrogated by the statute.

---

[32] *Millross*, 429 Mich at 183.

[33] *Id*., citing *Jones v Rath Packing Co*, 430 US 519; 97 S Ct 1305; 51 L Ed 2d 604 (1977).

[34] *Jones*, 430 US at 525.

[35] E.g., *Wold Architects & Engineers*, 474 Mich at 233-234 (considering "[w]hether a statutory scheme *preempts*, changes, or amends the common law" and concluding that, "[i]n this case, the language of the [Michigan Arbitration Act] does not show an intention to *abrogate* common-law arbitration") (emphasis added).

## C. ABROGATION

Properly framed, the question in this case is whether the Legislature intended to abrogate the common-law claims at issue here when enacting the LIGA. The common law is provided for in the Michigan Constitution. Article 3, § 7 of Michigan's 1963 Constitution specifies that "[t]he common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed." "The common law prevails except as abrogated by the Constitution, the Legislature, or this Court."[36] Consistently with these principles, we have developed rules to determine whether a statute abrogates the common law:

> The Legislature may alter or abrogate the common law through its legislative authority. Yet the mere existence of a statute does not necessarily mean that the Legislature has exercised this authority. We presume that the Legislature "know[s] of the existence of the common law when it acts." Therefore, we have stated that "[w]e will not lightly presume that the Legislature has abrogated the common law" and that "the Legislature should speak in no uncertain terms when it exercises its authority to modify the common law." As with other issues of statutory interpretation, the overriding question is whether the Legislature intended to abrogate the common law.[37]

The LIGA clearly abrogates *some* aspects of the common law. "At the common law, one who lost money in prohibited gaming or betting could not recover, the rule, in the absence of statute, being that the law will leave the parties *in pari delicto* where it finds

---

[36] *People v Woolfolk*, 497 Mich 23, 25; 857 NW2d 524 (2014) (quotation marks, citation, and brackets omitted); *People v Aaron*, 409 Mich 672, 722; 299 NW2d 304 (1980).

[37] *Murphy*, 509 Mich at 153 (citations omitted; alterations in *Murphy*).

them."[38] Stated differently, when "what occurred between the parties was a gaming transaction, . . . the courts will not interfere in behalf of a party to such a transaction."[39] There is no question that the LIGA abrogates this common-law rule because it legalizes online gambling. The Legislature clearly knew of the existence of this common-law rule when enacting the LIGA.

That does not mean that the LIGA abrogated *all* aspects of the common law. The Legislature is also presumed to know of existing common-law claims that would apply with equal force just as in any other dispute over a lawful transaction.[40] The LIGA does not speak to these common-law claims at all, nor does it speak in certain terms to abrogate these claims.[41] The LIGA does not even mention the common law. Accordingly, we see no basis to conclude that the Legislature intended to abrogate plaintiff's common-law claims for fraud, conversion, and breach of contract.

On appeal in this Court, defendant presents a new argument regarding abrogation. Specifically, it argues that there is no common-law right to recover winnings from gambling and that the LIGA did not purport to create any such right. We addressed this argument earlier: by permitting online gambling, the Legislature intended to abrogate any common-law rules premised on the assumption that gambling is unlawful. We also reject this argument for separate reasons. That is, defendant's position erroneously presumes that

---

[38] *Lassen*, 117 Mich at 512.

[39] *Helber*, 109 Mich at 669-670.

[40] See *Murphy*, 509 Mich at 153.

[41] See *id*.

19

the common law does not change. "The common law, however, is not static."[42]  As we have explained, "[t]he common law is always a work in progress and typically develops incrementally, i.e., gradually evolving as individual disputes are decided and existing common-law rules are considered and sometimes adapted to current needs in light of changing times and circumstances."[43]

The Legislature enacted the LIGA to legalize online gambling.  We would be remiss not to acknowledge that this shift in public policy may give rise to new rights under the law.  Because our existing common-law rules may be "adapted to current needs in light of changing times and circumstances,"[44] the common law is particularly well-suited to address ongoing developments arising from the LIGA.

Defendant also argues that the LIGA provides the exclusive remedy[45] for all online gambling disputes.  We reject this argument.  As we note later in this opinion, the LIGA

---

[42] *Price v High Pointe Oil Co, Inc*, 493 Mich 238, 242; 828 NW2d 660 (2013).

[43] *Id*. at 243; see also *Beech Grove Investment Co v Civil Rights Comm*, 380 Mich 405, 430; 157 NW2d 213 (1968) (opinion by ADAMS, J.) ("The common law does not consist of definite rules which are absolute, fixed, and immutable like the statute law, but it is a flexible body of principles which are designed to meet, and are susceptible of adaption to, among other things, new institutions, public policies, conditions, usages and practices, and changes in mores, trade, commerce, inventions, and increasing knowledge, as the progress of society may require.  So, changing conditions may give rise to new rights under the law . . . .") (quotation marks and citation omitted).

[44] *Price*, 493 Mich at 243.

[45] By "exclusive remedy" we refer to circumstances in which the Legislature has provided a statutory remedy or procedure that it intends to be the sole means for vindicating the rights in question.  See, e.g., *Monroe Beverage Co, Inc v Stroh Brewery Co*, 454 Mich 41, 45; 559 NW2d 297 (1997); *Pompey v Gen Motors Corp*, 385 Mich 537, 552; 189 NW2d 243 (1971).

does not provide any remedy or procedure for aggrieved patrons like plaintiff. Thus, there is no basis for concluding that the LIGA provides the exclusive remedy for such aggrieved patrons. Accordingly, we hold that there is no clear indication that the Legislature intended the LIGA to abrogate plaintiff's common-law claims.

## D. INCONSISTENCY

The Court of Appeals majority held that the "LIGA, like the MGCRA, is 'comprehensive legislation' that 'prescribes in detail a course of conduct to pursue and the parties and things affected, and designates specific limitations and exceptions.' "[46] We do not agree that the comprehensiveness of the statutory scheme by itself is dispositive of the question of "inconsistency." A more distinct inquiry is required.

The LIGA assigns to the MGCB specific powers and duties specified in the act "and all other powers necessary to enable it to fully and effectively execute this act to administer, regulate, and enforce the system of internet gaming established under this act."[47] Under the statutory scheme, licensees such as defendant receive certain rights that correlate with actions taken by the MGCB in exercising its specific powers and duties under the LIGA. The focus of this analysis need not hinge on whether plaintiff's claims may potentially "conflict with the MGCB's authority under LIGA to regulate all aspects of Internet gaming."[48] Rather, we consider whether plaintiff's claims in fact conflict with specific statutory and regulatory authority exercised by the MGCB.

---

[46] *Davis*, 348 Mich App at 414 (opinion of the Court), quoting *Kraft*, 261 Mich App at 545 (brackets omitted).

[47] MCL 432.305(1).

[48] *Davis*, 348 Mich App at 416.

So, for instance, in *Kraft*, the MGCB exercised its authority and approved the operation of two specific games. The plaintiffs brought a class action, claiming that the games fraudulently induced consumers to play the games by misrepresenting the playing odds, in violation of Michigan's common law.[49] The MGCB's decision to approve operation of the games in that case exempted the licensee under the MGCRA as to that particular common-law claim. Imposing liability on the *Kraft* defendant "would give rise to conflicting standards for gaming device manufacturers and casino licensees because a casino licensee could use a gaming device that had been vigorously tested and approved by the MGCB, only to have a different standard imposed through the medium of the common law."[50] In other words, the plaintiffs' claims were not compatible and were therefore "inconsistent" with the MGCRA. Thus, even though *Kraft* was bound to follow this Court's precedent using the misnomer of preemption, the *Kraft* Court reached the correct decision under our clarified approach.

Defendant's reliance on Rule 432.641(7) fares no better. That provision provides:

> On receipt of a complaint from an authorized participant or notification of an unresolved complaint from an internet gaming operator or internet gaming platform provider, the board may conduct any investigation the board considers necessary and may direct an internet gaming operator or internet gaming platform provider to take any corrective action the board considers appropriate. [Rule 432.641(7).]

---

[49] *Kraft*, 261 Mich App at 537-538.

[50] *Id*. at 551.

Defendant argues that because the MGCB could have taken "any corrective action [it] considers appropriate," but chose not to do so, the MGCB ostensibly determined plaintiff was not entitled to relief. We disagree.

The MGCB did not exercise its power to determine that plaintiff was not entitled to relief. More importantly, the LIGA does not obligate the MGCB to take such action. Rather, the LIGA plainly states that the MGCB "may" take action. Rule 432.641(7). Generally, "the term 'may' is 'permissive,' "[51] so the MGCB has discretion whether to act. Plaintiff's pursuit of her common-law claims in circuit court is not "inconsistent" with a statutory scheme that confers on the MGCB discretion to take corrective action, particularly when the MGCB has expressly disclaimed any role in resolving the merits of disputes between patrons and gaming providers.

The Court of Appeals majority relied on MCL 432.309—which sets forth the authority and powers of the MGCB—to support its conclusion that plaintiff's common-law claims are preempted by the LIGA. MCL 432.309 provides, in relevant part:

> (1) The board has jurisdiction over and shall supervise all internet gaming operations governed by this act. The board may do anything necessary or desirable to effectuate this act, including, but not limited to, all of the following:
>
> (a) Develop qualifications, standards, and procedures for approval and licensure by the board of internet gaming operators and internet gaming suppliers.
>
> (b) Decide promptly and in reasonable order all license applications and approve, deny, suspend, revoke, restrict, or refuse to renew internet gaming operator licenses and internet gaming supplier licenses. A party aggrieved by an action of the board denying, suspending, revoking,

---

[51] *Manuel v Gill*, 481 Mich 637, 647; 753 NW2d 48 (2008) (citation omitted).

restricting, or refusing to renew a license may request a contested case hearing before the board under the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328. A request for hearing under this subdivision must be made to the board in writing within 21 days after service of notice of the action by the board.

(c) Conduct all hearings pertaining to violations of this act or rules promulgated under this act.

(d) Provide for the establishment and collection of all applicable license fees, taxes, and payments imposed by this act and the rules promulgated under this act and the deposit of the applicable fees, taxes, and payments into the fund.

(e) Develop and enforce testing and auditing requirements for internet gaming platforms, internet wagering, and internet wagering accounts.

(f) Develop and enforce requirements for responsible gaming and player protection, including privacy and confidentiality standards and duties.

(g) Develop and enforce requirements for accepting internet wagers.

(h) Adopt by rule a code of conduct governing board employees that ensures, to the maximum extent possible, that persons subject to this act avoid situations, relationships, or associations that may represent or lead to an actual or perceived conflict of interest.

(i) Develop and administer civil fines for internet gaming operators and internet gaming suppliers that violate this act or the rules promulgated under this act.

(j) Audit and inspect books and records relevant to internet gaming operations, internet wagers, internet wagering accounts, internet games, or internet gaming platforms, including, but not limited to, the books and records regarding financing and accounting materials held by or in the custody of an internet gaming operator or internet gaming supplier.

(k) Acquire by lease or by purchase personal property, including, but not limited to, any of the following:

(*i*) Computer hardware.

(*ii*) Mechanical, electronic, and online equipment and terminals.

(*iii*) Intangible property, including, but not limited to, computer programs, software, and systems.

(2) The board may investigate and may issue cease and desist orders and obtain injunctive relief against a person that is not licensed by the board that offers internet gaming in this state.

We agree with dissenting Judge FEENEY that "a review of that list reflects extensive authority over the licensing of online casinos, an establishment of rules by which those licenses are obtained (and perhaps revoked), casino operations, and procedures for sanctioning online casinos that violate the statute and rules. What is not found in the list is the authority, much less the obligation, to resolve individual patron disputes such as those presented here."[52] Other than Rule 432.641(7), allowing the MGCB to direct an operator or provider to take "corrective action" to resolve a dispute between a patron and licensee, there is no indication in the LIGA that the MGCB has authority to resolve the dispute in this case.[53]

_____

[52] *Davis*, 348 Mich App at 423 (FEENEY, J., dissenting). The same holds true for Rule 432.632a; Mich Admin Code, R 432.637a; Rule 432.652; and Mich Admin Code, R 432.613. Notably, Rule 432.652(1)(c)(v) requires the participant to "[c]onsent to the jurisdiction of this state to resolve any disputes arising out of internet wagering."

[53] One other aspect of the lower courts' analysis bears clarifying. After concluding that plaintiff's claims were "preempted" by the LIGA, the circuit court dismissed them under MCR 2.116(C)(4) for lack of jurisdiction. The Court of Appeals majority affirmed this disposition, concluding that the LIGA vested the MGCB with "exclusive jurisdiction" over plaintiff's claims and, accordingly, that the circuit court lacked subject-matter jurisdiction. *Davis*, 348 Mich App at 417 (opinion of the Court). Both courts were wrong, though for different reasons.

As already discussed, the relevant inquiry here is *abrogation*, not *preemption*. But regardless of whether plaintiff's common-law claims were abrogated or preempted, that would not have deprived the circuit court of *subject-matter jurisdiction*. See *Buczkowski v Buczkowski*, 351 Mich 216, 221; 88 NW2d 416 (1958) (noting the distinction between "the erroneous exercise of jurisdiction and the want of jurisdiction") (quotation marks and citation omitted); *Foster v Foster*, 505 Mich 151, 176-181; 949 NW2d 102 (2020)

## III. CONCLUSION

We conclude that the Legislature did not intend to abrogate plaintiff's common-law claims when enacting the LIGA, and plaintiff's claims are not inconsistent with the LIGA so as to be prohibited by MCL 432.304(3). We reverse the judgment of the Court of Appeals affirming the circuit court's decision granting defendant summary disposition, and we remand the case to the circuit court for further proceedings consistent with this opinion. We do not retain jurisdiction.

Brian K. Zahra
Megan K. Cavanagh
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

HOOD, J., did not participate because the Court considered this case before he assumed office.

---

(*Foster I*) (VIVIANO, J., concurring) (explaining that federal preemption does not necessarily deprive a state court of subject-matter jurisdiction); *Foster v Foster*, 509 Mich 109, 127 n 9; 983 NW2d 373 (2022) (*Foster II*) (adopting the reasoning of Justice VIVIANO's concurrence in *Foster I*). As the Court of Appeals majority correctly pointed out, dismissal for lack of subject-matter jurisdiction is proper if a court concludes that the power to hear a claim is vested exclusively in another forum—like an administrative agency or a federal court. But absent such a finding, a court is not deprived of jurisdiction to hear a claim, even if that claim will be preempted or abrogated by state or federal statute. Accordingly, the circuit court erred by granting defendant's motion for summary disposition under MCR 2.116(C)(4). While the Court of Appeals applied the correct analytical framework when it considered whether the MGCB was vested with exclusive subject-matter jurisdiction over plaintiff's claims, it erred in its application of that framework. As described in this opinion, we conclude that plaintiff's claims were not abrogated by the LIGA, nor was the MGCB given the power to decide them.

26